Filed 9/8/14  P. v. Covian CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. JOSE ARNULFO COVIAN, Defendant and Appellant. | H037986 (San Benito County Super. Ct. No. CR0702369) |

Defendant Jose Arnulfo Covian appeals from a judgment of conviction entered after a jury found him guilty of first degree murder (Pen. Code, § 187).  The trial court sentenced defendant to state prison for 25 years to life.  On appeal, defendant raises contentions relating to the sufficiency of the evidence, jury instructions, and ineffective assistance of counsel.  We affirm the judgment.[1]

## I.  Statement of Facts

### A.  The Prosecution Case

At about 10:00 p.m. on December 3, 2007, Carlos Argueta and his friend Alejandro Hurtado were walking towards Hurtado's house on Homestead Avenue in Hollister.  Defendant, who was standing nearby, called out to Hurtado and offered him a

---

[1]     Defendant has also filed a petition for writ of habeas corpus, which we dispose of by separate order.

beer, but Hurtado responded, "No, you're already drunk." Argueta also declined defendant's offer. After defendant said that he would be by later, Hurtado told him that everyone was sleeping at his house and he was going to go to bed.

When Argueta and Hurtado arrived at Hurtado's house, they went into the garage. The garage door was closed. The garage also had a side door which could be accessed from the street through a gate. The latch to the gate was on the inside of the gate and away from the street. One could reach the latch from the street side of the gate by reaching over the top of the gate.

Hurtado called his friend Joann Martinez from the garage. Argueta testified that Hurtado asked her to give Argueta a ride home. Martinez testified that Hurtado asked her to come over, because he wanted her to find some methamphetamine for Argueta. When Martinez arrived at the house, she called Hurtado on her cell phone and asked if Argueta was ready. She also told him that she saw something suspicious. Argueta went outside, opened the gate, and waited for her to get out of her car. According to Martinez, she had seen three men, including defendant, "hanging out" on the corner near the Hurtado house.

Argueta testified that he opened the side garage door for Martinez. According to Argueta, it was approximately 10:15 p.m. or 10:30 p.m. However, Martinez testified that she arrived at the Hurtado house at 9:00 p.m. and she had been unable to find any methamphetamine for Argueta.

Martinez testified that sometime between 10:30 p.m. and 11:00 p.m., she heard banging on the closed garage door. Hurtado asked them what they wanted and told them that if they had a beef, he would meet them around the corner. They left. Argueta testified, however, that sometime after Martinez arrived, defendant opened the side garage door. Argueta prevented defendant from entering the garage. Hurtado told defendant, "Don't do that because you're lacking respect, I've never gone to your house." It had been about 10 minutes since defendant had offered them a beer. Defendant appeared angry and left. As defendant left, he said, "Later, we'll see each other."

Approximately 10 minutes later, defendant returned to the garage and knocked or hit loudly on the side door. Defendant was angry and yelled, "Come outside, I want to fight with you, and, I have my soldiers." Argueta told Hurtado to wait and that he would go outside. When Argueta went outside, defendant said, "Where is Alex, I want to fight with him." Argueta asked him why he wanted to fight. Defendant responded that Hurtado was very conceited and thought a lot of himself. Hurtado told defendant to leave. Hurtado also told Argueta to come inside because defendant was drunk. After defendant tried "to go on top of" Hurtado, Argueta grabbed him and told him to calm down. Defendant left with his three companions. Hurtado and Argueta then put some bent nails in the gate latch so that the gate could not be opened.

About 10 to 15 minutes later, Hurtado and Argueta heard the voices and someone pulling on the side gate. It was about 11:35 p.m. or 11:40 p.m. Defendant had returned with the same three companions, and defendant again challenged Hurtado to fight. Hurtado said, "Now this guy is making me very tired, I'm getting very tired." Hurtado was also angry because defendant kept coming back and his parents were sleeping.

Hurtado told Argueta and Martinez to stay in the garage, grabbed a small steel bar from a weight-lifting set, and went outside. Hurtado was right-handed and was holding the bar in his right hand. Argueta testified that he followed Hurtado, but Martinez testified that Argueta remained in the garage with her. Argueta saw defendant trying to reach over the top of the gate to remove the nails. Hurtado hit defendant's forearm with the bar, though he "didn't hit him very well. It just brushed passed his hand." At that point, the gate opened, defendant "threw himself to the ground" and asked Hurtado, "What's wrong?" and "Why are you hitting me?" Hurtado replied that defendant had worn him out and he asked defendant what he wanted. Defendant was kneeling on one leg in a crouched position with his forearm raised around the level of his eyes or forehead. Defendant's right hand was inside his sweater sleeve. When defendant asked

3

Hurtado why he was hitting him, Hurtado responded, "I'm not hitting you, I just said, What is the problem you have with me?" Defendant did not answer.

Argueta then heard voices say, "Leave us in p[ea]ce." Before Argueta turned toward defendant's companions, defendant and Hurtado were approximately three feet apart. Argueta looked towards defendant's companions. When Argueta said that no one was hitting defendant and they should take him home because he was drunk, they responded that they wanted to fight. Argueta took about four steps towards them as he pushed the sleeves of his sweater up. Before Argueta began fighting with defendant's companions, he saw Hurtado, who was holding the bar "down, like in the middle" and not raised up, turn towards him. At that point, Argueta turned and saw defendant jump from a crouching position and grab Hurtado with both hands.[2] Defendant then said, "I got him, I got him" and began running away. Hurtado took five or six steps, and started swaying. Argueta told Martinez to call an ambulance, but Hurtado died before it arrived.

As the police were arriving, Argueta left. Argueta was on probation following a conviction for being under the influence of methamphetamine. He had a warrant for his arrest, because he had violated the terms of his probation. Argueta hid in a shed behind the Hurtado garage until about 4:30 a.m. or 5:00 a.m.

Alejandro Covian, defendant's nephew, testified that he lived with his grandparents and defendant on Homestead Avenue in Hollister in December 2007. Sometime after 10:00 p.m. on December 3, 2007, Alejandro lent defendant $20 to buy "crystal" from Hurtado. According to Alejandro, defendant frequently bought methamphetamine from Hurtado, and Hurtado was the only person from whom defendant bought drugs.

---

[2]    Martinez heard wrestling sounds and went outside with Argueta. She never saw Hurtado try to hit anyone with the bar after the gate was opened. She saw defendant and Hurtado entwined as they were fighting, but she did not see a knife or see Hurtado get stabbed. Martinez called 911.

Alejandro accompanied defendant on his first visit to the Hurtado house, but he remained in the truck while defendant approached the house. Alejandro did not see what transpired between defendant and Hurtado. However, Alejandro heard Hurtado say something like, "Come in a couple of minutes" to defendant. About five minutes later, defendant returned to the truck and said that Hurtado did not have any drugs for sale.

Defendant and Alejandro returned home where they were joined by their neighbors Alfredo and Urbano. They sat in the truck and drank beer for about 15 minutes. Defendant then walked to Hurtado's house. Five minutes later, Alejandro walked towards Hurtado's house and met defendant as he was walking home. When they returned to the truck, defendant showed him the drugs that he had just bought from Hurtado. Defendant became upset because Hurtado had not given him the amount that he had paid for.

Defendant returned to Hurtado's house, and Alejandro, Urbano, and Alfredo followed him. When they arrived, Alejandro saw Hurtado swinging at defendant with a bar and hit his shoulder "a couple of times . . . more than two." Defendant asked Argueta, "Why is he hitting me?" Defendant was also "trying to block him" and "trying to cover himself." Alejandro heard defendant say "I got him" once or twice, and then run past him back to the truck parked in front of his own house. Alejandro, Urbano, and Alfredo followed defendant to the truck where they continued to drink beer. Defendant told them that he had stabbed Hurtado and he was scared. Alejandro stated that he did not think that defendant had stabbed Hurtado, because Hurtado acted "like nothing happened." Defendant responded that "he felt it" and he was scared. Defendant then produced a knife and stabbed the seat of the truck. Shortly thereafter, they heard the police and ambulance sirens. Alfredo and Urbano left, and defendant and Alejandro entered their house. They were all scared.

The police contacted Alejandro in the early morning hours of December 4, 2007. Alejandro was "scared" and "traumatized" and did not tell the police that Hurtado hit

5

defendant. In February 2009, Alejandro told the officer that Hurtado hit defendant on the arm.

Dr. John Hain testified as an expert in forensic as well as anatomic and clinical pathology. After he conducted an autopsy of Hurtado on December 5, 2007, he concluded that Hurtado bled to death as a result of a single stab to the area between his fifth and sixth ribs. In Dr. Hain's opinion, the knife which inflicted the injury had a blade of around six inches. The wound was consistent with having been caused by a knife which was found at defendant's house.

Dr. Hain also examined Hurtado's clothing and concluded that Hurtado's arms were not raised above the level of the wound. He explained that if Hurtado's arms had been raised above the level of the wound when he was stabbed, there would have been a greater discrepancy between the position of the wound and the position of the corresponding tear on his sweatshirt.

Officer Rose Pacheco was dispatched to the scene and took a brief statement from Martinez. After Officer Pacheco heard Martinez's description of the perpetrator, she thought of defendant as a possible suspect. When she took Martinez for the showup, defendant had his hair pulled up in a ponytail. Martinez asked for him to remove his pony tail, which he did. Martinez then positively identified him as the perpetrator.

Sergeant Don Pershall testified regarding the procedure that he had followed to obtain an eyewitness identification of defendant from Martinez. He went to the county jail to obtain a photographic lineup. However, he had some difficulty because he did not have photographs with defendant's current hair style. When Sergeant Pershall used a photograph with defendant's hair slicked back, Martinez was unable to make an identification.

Captain Carlos Reynoso spoke to defendant at his house in the early morning hours of December 4, 2007, and asked him if there was anything that he wanted to tell him prior to going outside for a field lineup. Captain Reynoso told him that the police

6

were there "to investigate an incident that had happened down the street earlier that night" and indicated that there was "some kind of fight or disturbance." Defendant stated that he did not know anything about what was going on, and he denied any knowledge of any incident that had occurred. He also stated that he had been drinking and indicated that he was intoxicated. When Captain Reynoso asked if he had any injuries, defendant replied that he had no injuries. Captain Reynoso also asked him if he had been hit by a pipe, and defendant said no.

While waiting for the witness to arrive for the field lineup, defendant asked "[W]hat happened with the man from down the street[?]" Defendant also asked how Hurtado "was doing, and he asked if they had killed him." Captain Reynoso did not know whether any of the other officers had mentioned a killing to defendant. Captain Reynoso talked to defendant about finding a metal bar at the crime scene and "not knowing whether this was possibly a self-defense type of incident . . . ." However, defendant never admitted that he was present at the Hurtado house. After Martinez identified defendant as having been involved in the Hurtado homicide, defendant was arrested. As defendant was placed in the patrol car, he said to Captain Reynoso, "You're wrong."

At approximately 4:00 a.m., Captain Reynoso advised defendant of his *Miranda*[3] rights, which he waived. Defendant stated that he had been drinking beer outside his house when he saw some individuals running towards his house and then jumping nearby fences. Defendant continued drinking until police cars began to arrive. He then ran into his house because he was concerned that he "might get in trouble for drinking outside . . . ."

Defendant admitted to Captain Reynoso that he knew Hurtado and stated that they had not gotten into an argument. He referred to their relationships as "cool." Defendant

---

[3]     *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

7

then asked Captain Reynoso "if [Hurtado] was the one that was stabbed." He replied that he "had never mentioned anyone being stabbed." When Captain Reynoso told defendant that he was under arrest for murder, defendant asked him "not to advise his mother what he was being arrested for."

At about 2:30 p.m. that same day, defendant was again advised of his *Miranda* rights, which he waived. Captain Reynoso asked defendant to tell his side of the story. Defendant said that he had been drinking outside his home and also smoked some marijuana. When defendant was told that this was inconsistent with his nephew's statement, defendant said "that that was his side of the story . . . ." Defendant said his nephew was "a young guy and he's not very smart, he doesn't know what he's talking about." He claimed that he had last seen Hurtado two months earlier. Defendant denied that he offered Hurtado a beer or whistled to him that night. Defendant told Captain Reynoso that he had the wrong guy.

In February 2008, Sergeant Pershall collected various items, including a bed sheet, a writing tablet, and a beanie, from defendant's jail cell. The bed sheet had "187 Case Prison" written on it in several places as well as "1985." "187" is the Penal Code section for murder and 1985 is the year that defendant was born. The writing table had "187 Case" and "Pepe" written on it. Pepe is defendant's nickname. The beanie had "187" written on it. Defendant did not have any cellmates. In Sergeant Pershall's opinion, the items indicated that defendant was "bragging" but was "not necessarily" confessing to the crime.

Lorena Hurtado Scalmanini, Hurtado's sister, testified about Hurtado's good character and relationship with his family.

### B. The Defense Case

Dr. David Posey, an expert in forensic pathology, testified that Hurtado bled to death from a stab wound. He opined that the absence of a hilt mark on Hurtado's body

indicated that it could have been an accidental stabbing or a defensive stabbing. Based on the absence of other injuries to Hurtado, Dr. Posey testified: "I don't get the feeling that the aggressor's intentions were meant to stab him." He also testified that based on the position and path of the knife wound, Hurtado was leaning forward and "had to have his hand up extended" when he was stabbed.

Dr. Posey discussed Hurtado's post-mortem toxicology report, which showed that Hurtado's methamphetamine level was 0.71 milligrams per liter. The "potentially toxic" range for methamphetamine begins at 0.2 milligrams per liter and extends to 5.0 milligrams per liter. According to Dr. Posey, only a chronic user could tolerate the high dosage that Hurtado had in his body and Hurtado was under the influence of methamphetamine when he died. Dr. Posey testified that chronic users of methamphetamine will have delusions as well as visual and audio hallucinations. They will also be paranoid and aggressive. Dr. Posey noted that the weight-lifting bar which Hurtado was swinging at defendant was 14 inches long and potentially a lethal weapon, because it could fracture a skull with the application of only minimal force. In his opinion, Hurtado was the aggressor because he was under the influence of methamphetamine and armed with a club. However, Dr. Posey formed this opinion without knowing that there was evidence that defendant had challenged Hurtado to fight. Dr. Posey was also not aware that defendant had stated that he had "soldiers" with him.

Dr. Taylor Fithian testified as an expert witness in the area of the effects of methamphetamine on human behavior. According to Dr. Fithian, chronic users of methamphetamine have "a great deal of emotional ups and downs," are violent, and experience "alterations in [their] perception of the world . . . ." Methamphetamine can also cause a user to experience "delusions where you think that people are trying to kill you or people are out to hurt you" as well as auditory and visual hallucinations. Chronic methamphetamine users "become very delusional and very psychotic. They can look like someone who's very, very crazy; like someone who we call schizophrenic." In his

9

opinion, Hurtado was "clearly under the influence of methamphetamine and would have had signs and symptoms of methamphetamine intoxication and possibly psychosis."

James Huggins, a defense investigator, testified that he interviewed Argueta at an immigration detention facility. They discussed the status of his "deportation status appeal," and Argueta told him that he "lost his appeal and a person name[d] Candy was helping him with the appeal letter." Huggins determined that "Candy" referred to the prosecutor, District Attorney Candice Hooper. Argueta also stated that Candy wrote a letter on his behalf to help him obtain a U-VISA, which was "like getting asylum." Huggins understood Argueta's definition of asylum to mean that Argueta would remain in the United States until he testified at defendant's trial. Argueta also believed that he would be "getting out to go see his dying mother." Huggins confirmed that "paperwork" was required from the district attorney's office in San Benito County to ensure that an individual, who had been scheduled for deportation and was a material witness in a murder case, remained in the United States in order to be available to testify at the trial.

Argueta testified that he told Huggins that his appeal was currently in the Ninth Circuit Court of Appeals. He did not tell Huggins that anyone was helping him with his deportation issues. Argueta told Huggins that his attorney "sent a letter to Candace because [he] was already deported. But they can't deport anyone if they have a court appearance coming up; so the person has to go to court first, then get deported."

Gregory LaForge was defendant's attorney in September 2008 and was present at defendant's preliminary hearing. At that time, LaForge witnessed a demonstration by Deputy District Attorney Patrick Palacios and Argueta of the relative positions of Hurtado and defendant prior to the stabbing. Argueta, who portrayed defendant, was down on his right knee and his left knee was up while Palacios, who portrayed Hurtado, had raised his hand holding the simulated steel bar "straight up."

10

## II.  Discussion

### A.  Sufficiency of the Evidence

Defendant contends that the evidence was insufficient to prove the elements of first degree murder.

### 1.  Standard of Review

"The law we apply in assessing a claim of sufficiency of the evidence is well established:  ' " ' " '[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " ' " '  [Citation.]  The standard is the same under the state and federal due process clauses.  [Citation.]  'We presume " 'in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'  [Citation.]  This standard applies whether direct or circumstantial evidence is involved." [Citations.]'  [Citation.]"  (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 294 (*Gonzales*).)

### 2.  Deliberation and Premeditation

"All murder which is . . . willful, deliberate, and premeditated killing . . . is murder of the first degree."  (Pen. Code, § 189.)  "A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill.  [Citation.]  'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance.  [Citations.]  'The process of premeditation and deliberation does not require any extended period of time.  "The true test is not the duration of time as much as it is the extent of the reflection.  Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . ." [Citations.]' "  (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.)

Here, defendant was "not happy" when Hurtado declined his offer of a beer. Defendant then said that he would be by later, but Hurtado told him not to come to his

house because everyone was sleeping. Nevertheless, defendant arrived at the Hurtado home, entered the property through a gate, and opened the side garage door. After Argueta stood in front of defendant and Hurtado told him not to enter the garage, defendant became angry and left, saying "Later, we'll see each other."

About 10 minutes later, defendant returned to Hurtado's garage and knocked or hit loudly on the side door. Defendant was angry, challenged Hurtado to a fight, and announced that his "soldiers" were with him. When Argueta went outside, defendant asked where Hurtado was and stated that he wanted to fight him. Argueta asked defendant why he wanted to fight him, and defendant responded that Hurtado was conceited and thought a lot of himself. Hurtado told defendant to leave. After defendant tried to reach Hurtado, Argueta grabbed him and told him to calm down. Defendant and his three companions then left, and Hurtado and Argueta tried to lock the gate with some nails.

About 10 to 15 minutes later, defendant returned to the Hurtado property for a third time. Hurtado grabbed a steel bar from a weight-lifting set and went outside. Defendant, who was accompanied by the same three people, was trying to remove the nails in order to enter through the gate. Hurtado swung the bar at defendant's arm and delivered a glancing blow to his forearm. At that point, the gate opened and defendant threw himself to the ground where he knelt down in a crouching position with his forearm raised around his eyes and forehead and asked Hurtado, "What's wrong?" and "Why are you hitting me?" Defendant's right hand was hidden inside his sweater sleeve. Defendant and Hurtado were about three feet apart.

When Argueta told defendant's companions to take defendant home, they challenged him to a fight. Before Argueta began fighting with them, he saw Hurtado, who was holding the bar "down," turn towards him. At that point, Argueta turned around and saw defendant jump from the crouching position and grab Hurtado with both hands.

12

Defendant then said, "I got him, I got him." As defendant ran away, he told his companions, "Let's go, Let's go. I got him."

The jury could reasonably infer from this evidence that defendant was eager to fight Hurtado, wanted to confront him outside, and had concealed his knife in his sweater sleeve. Defendant's repeated visits to the Hurtado property, his stated intention to fight Hurtado, his concealed knife, his jump toward Hurtado as Hurtado's attention was diverted, and his statements of "I got him, I got him" after he stabbed Hurtado reasonably supported the jury's conclusion that defendant had thought the killing over in advance and had carefully weighed the considerations in forming this course of action. Thus, there was substantial evidence that the killing of Hurtado was deliberate and premeditated.

Relying on *People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*), defendant argues that the evidence was insufficient to support a finding of deliberation and premeditation. *Anderson* stated: "The type of evidence which this court has found sufficient to sustain a finding of premeditation and deliberation falls into three basic categories: (1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing— what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2). [¶] Analysis of the cases will show that

13

this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." (*Id.* at pp. 26-27.)

The California Supreme Court has subsequently clarified the application of the *Anderson* factors. It noted that "[t]he *Anderson* guidelines are descriptive, not normative. . . . [¶] . . . The *Anderson* factors, while helpful for purposes of review, are not a sine qua non to finding first degree premeditated murder, nor are they exclusive." (*People v. Perez* (1992) 2 Cal.4th 1117, 1125.) The court has also stated that "[u]nreflective reliance on *Anderson* for a definition of premeditation is inappropriate. The *Anderson* analysis was intended as a framework to assist reviewing courts in assessing whether the evidence supports an inference that the killing resulted from preexisting reflection and weighing of considerations. It did not refashion the elements of first degree murder or alter the substantive law of murder in any way." (*People v. Thomas* (1992) 2 Cal.4th 489, 517.)

Defendant first focuses on the lack of planning activity. He argues that "[w]hile it is undoubtedly true that [he] took a knife to Hurtado's house and that a knife is a deadly weapon, . . . [i]f [he] had the knife with him the entire evening – and nothing in the record suggests that he did not – then the fact that he happened to have it at the moment when he concluded that he needed to defend himself against Hurtado's attack does not show that prior to the killing 'the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing.'" First, as discussed *infra*, the jury could have reasonably concluded that defendant did not need to defend himself against Hurtado. Second, even assuming that defendant routinely carried a knife, the jury could have also reasonably concluded that defendant's removal of the nails from the gate latch, his concealment of the knife in his sweater sleeve as he entered through the gate as well as his repeated visits to the Hurtado property to confront Hurtado established planning activity.

14

Defendant argues, however, that his repeated visits "do[] not suggest a preconceived design to kill Hurtado." Relying on Alejandro's testimony that Hurtado sold defendant a baggie of methamphetamine on his second visit to the house, he claims that there was no evidence that he made multiple visits to gain an opportunity to attack Hurtado. However, it was the jury's role to determine the credibility of the witnesses, and it could have reasonably found that Alejandro's testimony was not credible. (*People v. Lee* (2011) 51 Cal.4th 620, 632 (*Lee*).) Drawing all inferences in favor of the judgment, we must presume the jury concluded that defendant went repeatedly to the Hurtado property to confront Hurtado. (*Gonzales*, *supra*, 52 Cal.4th at p. 294.)

Defendant next contends that his "shouting 'I got him' was just as likely to have been his expression of surprise, shock, or horror at what he had just done," as it was a declaration that he had carried out a plan to kill. Here, defendant concealed his knife and then declared "I got him" after stabbing Hurtado as he fled. Based on this evidence, the jury could have reasonably concluded that defendant's declaration meant "I got him, as I intended to do." The jury was not required to interpret the statement as defendant has. (*Gonzales*, *supra*, 52 Cal.4th at p. 294.)

### 3. Justifiable Self-defense

Defendant argues that the evidence was insufficient to prove that he did not act in justifiable self-defense.

"For killing to be in self-defense, the defendant must actually and reasonably believe in the need to defend. [Citation.] . . . To constitute 'perfect self-defense,' i.e., to exonerate the person completely, the belief must also be objectively reasonable. [Citations.]" (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082, fn. omitted (*Humphrey*).) "[T]he right of self-defense is based upon the appearance of imminent peril to the person attacked." (*People v. Perez* (1970) 12 Cal.App.3d 232, 236.) The prosecution has the burden of proving beyond a reasonable doubt that the killing was not

15

justified by defendant's need to defend himself. (*Humphrey*, at p. 1103; *People v. Lee* (2005) 131 Cal.App.4th 1413, 1429.)

Here, Argueta testified that he saw Hurtado swing the bar at defendant's arm and deliver a glancing blow as defendant was reaching over the top of the gate in order to enter the property. After the gate opened, defendant threw himself to the ground and knelt on one knee. Argueta then saw defendant jump from a crouching position toward Hurtado, embrace him, and say "I got him. I got him." Prior to the stabbing, Argueta observed that Hurtado did not hold the bar in a threatening position. This observation was corroborated by Dr. Hain's testimony that Hurtado's arms could not have been raised above the level of the wound when he was stabbed. Thus, there was substantial evidence to support the jury's conclusion, beyond a reasonable doubt, that defendant did not kill Hurtado in self-defense because he could not have reasonably believed that he was in imminent danger of being killed or suffering great bodily injury.

Defendant relies on Alejandro's testimony that Hurtado repeatedly hit defendant with the steel bar and Dr. Posey's testimony that a blow from the bar could have easily been fatal. However, defendant fails to acknowledge that "'it is the exclusive province of the . . . jury to determine the credibility of a witness . . . .'" (*Lee*, *supra*, 51 Cal.4th at p. 632.) Here, the jury was entitled to determine that Argueta was more credible than Alejandro.

Defendant next asserts that Argueta's testimony was "particularly contradictory on the point of whether he saw the stabbing itself," and could not testify regarding what occurred between him and Hurtado immediately before the stabbing. Thus, he contends that "Argueta's testimony did not satisfy the prosecution's burden of proving that [he] did not stab Hurtado in response to an actual, credible, imminent threat of being seriously injured or killed by the steel bar that Hurtado was holding."

In response to the prosecutor's question of whether he could "still see what was going on around" him when he looked towards defendant's companions, Argueta testified

16

that he could.  He further testified:  "I was on the side in front of the garage.  So when I went in front, I started raising my sleeves.  That's when I said, What do you want, What's wrong?  That's when I turned around and saw that [defendant] jumped and grabbed him.  And he said, I got him, I got him."  The following colloquy then occurred:  "Q.  I'm asking you to focus on just the moments before that.  You had stated that you saw [Hurtado] turn towards you, and as [Hurtado] was turning towards you is when [defendant] was coming out of that crouching position; does that accurately say what had been said earlier?  [¶]  A.  That's correct.  [¶]  Q.  Okay.  That's the time frame I'd like to focus on.  [¶]  All right.  So [Hurtado] turns towards you; is that correct?  [¶]  A.  Yes.  [¶]  Q.  Where is the bar?  [¶]  A.  In his hand, of [Hurtado].  [¶]  Q.  In what position?  [¶]  A.  Down, like in the middle.  [¶]  Q.  So not raised up, but not down on the ground?  [¶]  Was he holding it -- or take that back.  Strike that.  [¶]  Did you see it as threatening, the way he was holding it, at that particular time?  Did it look threatening to you?  [¶]  A.  He wasn't threatening.  If he had been threatening, he would have been hitting.  [¶]  Q.  So as [Hurtado] turns towards you, is this the time that the Defendant comes out of his crouching position?  [¶]  A.  It's true, yes."

Defendant relies on a different portion of Argueta's testimony.  "Q.  So describe this to us, this jump.  [¶]  A.  When he jumped, when [defendant] jumped, at that moment he knew where to hit [Hurtado].  [¶]  Q.  Had anyone advanced towards the other?  [¶]  A.  Everything is the same as I told you just a minute ago.  He was crouching, and at the moment when he saw that I was arguing with the others, [Hurtado] just turned to see where the others were; and that's when he had the opportunity to jump up, and *I think* that's when he got him."  (Italics added.)  Defendant argues that this testimony and particularly the reference to "I think" "make it clear that what [Argueta] was demonstrating was merely their positions prior to the moment when he turned away to confront [defendant's] three friends," and thus Argueta "did not see what happened

17

between [defendant] and Hurtado between the moment when he turned away and the moment that he turned back."

However "'[t]o warrant rejection of the statements given by a witness who has been believed by the [trier of fact], there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inference or deductions.'" (*People v. Barnes* (1986) 42 Cal.3d 284, 306.) Here, no such circumstances exist, and thus this court cannot reject Argueta's testimony that he saw that Hurtado did not threaten defendant with the steel bar immediately before he was stabbed.

Defendant also argues that nothing in the record "suggests that it was unreasonable for [defendant] to believe that Hurtado would continue swinging the bar until he succeeded in breaking [defendant's] arm, or worse, if [defendant] did not stop him." The jury was entitled to consider other aspects of the confrontation, which defendant has chosen to ignore. "A person does not have the right to self-defense if he provokes a fight or quarrel with the intent to create an excuse to use force." (CALCRIM No. 3472; see *Fraguglia v. Sala* (1936) 17 Cal.App.2d 738, 743-744.) Here, defendant had been told repeatedly not to come to the Hurtado property, and he was on the other side of the gate and attempting to remove the nails in the gate latch when Hurtado "brushed his forearm" with the bar. Under these circumstances, the jury could have reasonably concluded that defendant provoked a fight with Hurtado so that he could use his knife.

Defendant next contends that "it is just as likely that [defendant's] crouching posture indicated a submission and a desire to stop fighting, and it is just as likely that his embrace of Hurtado was an attempt to immobilize Hurtado's arms and stop the attack with the steel bar, as it is that either of those facts indicated [defendant's] intention to commit an unprovoked attack." However, the jury could have reasonably concluded that it was the latter. (*Gonzales*, *supra*, 52 Cal.4th at p. 294.)

Defendant also focuses on Dr. Hain's testimony that Hurtado's "hands [were] not over his head" when he was stabbed. He argues that "[b]ecause Hain never addressed the

18

question of whether Hurtado could have had *one* hand raised consistently with the damage to his sweatshirt, his testimony does not constitute proof that Hurtado was not preparing to bring the bar down on [defendant's] skull when [defendant] stabbed him." Defendant, however, is speculating as to whether Dr. Hain's testimony would have been different if he had addressed this question.

### 4. Imperfect Self-defense

Defendant contends that the evidence was insufficient to prove that he did not act in imperfect self-defense.

"Imperfect self-defense is the actual, but unreasonable, belief in the need to resort to self-defense to protect oneself from imminent peril. [Citations.] When imperfect self-defense applies, it reduces a homicide from murder to voluntary manslaughter because the killing lacks malice aforethought. [Citations.]" (*People v. Vasquez* (2006) 136 Cal.App.4th 1176, 1178.) "*Imperfect self-defense* obviates malice because that most culpable of mental states 'cannot coexist' with an actual belief that the lethal act was necessary to avoid one's own death or serious injury at the victim's hand. [Citations.]" (*People v. Rios* (2000) 23 Cal.4th 450, 461.) It is the prosecution's burden to prove beyond a reasonable doubt that a defendant did not act in imperfect self-defense. (*Id.* at p. 462.)

Here, there was substantial evidence from which the jury could have reasonably concluded that defendant did not have an actual belief that the stabbing was necessary to avoid his own death or serious injury. Defendant fled the scene and thus demonstrated a consciousness of guilt when considered with other evidence. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1055.) Shortly thereafter, defendant told police that he knew Hurtado and their relationship was "cool." Though the officer told him that a metal bar had been found and he did not know whether this was "a self-defense type of incident," defendant never indicated that he had acted in self-defense. Defendant also denied being hit by a pipe. Thus, there was substantial evidence to support the jury's finding.

19

Defendant argues, however, that he was unsophisticated about the law and he feared that if he did not leave the scene, Argueta would attack him. He also lied to the police based on his fear that "if he told the truth, he would be arrested, tried, and convicted of first-degree murder, self-defense or no self-defense. . . ." However, the jury could have reasonably rejected these arguments to explain his conduct and concluded that his flight and statements to the police established that he did not have an actual belief in the necessity of stabbing Hurtado. (*Gonzales*, *supra*, 52 Cal.4th at p. 294.)

### 5. Heat of Passion

Defendant argues that the evidence was insufficient to prove that he did not act in the heat of passion.

"The mens rea element required for murder is a state of mind constituting either express or implied malice. A person who kills without malice does not commit murder. Heat of passion is a mental state that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter. Heat of passion arises if, ' "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." ' [Citation.] Heat of passion, then, is a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation. While some measure of thought is required to form either an intent to kill or a conscious disregard for human life, a person who acts without reflection in response to adequate provocation does not act with malice." (*People v. Beltran* (2013) 56 Cal.4th 935, 942 fn. omitted.) "Provocation is adequate only when it would render an ordinary person of average disposition 'liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.' [Citation.]" (*Id.* at p. 957.)

20

Here, defendant went to the Hurtado property to fight him, but left after Argueta prevented him from entering. When defendant did not have the opportunity to fight Hurtado on his second visit, he returned 10 to 15 minutes later. At this third visit, as defendant was trying to remove the nails in the gate to enter the property, Hurtado swung the steel bar and grazed his forearm. After the gate opened, defendant entered the property and knelt on one knee with his knife concealed by his sweater sleeve. At this point, Hurtado was not holding the steel bar in a threatening manner. Based on this record, the jury could have reasonably found that defendant's reason was not disturbed by a passion that would have rendered a person of average disposition to act rashly and without deliberation and reflection.

Defendant's reliance on Alejandro's testimony to support his argument is misplaced. As previously stated, it was the jury's role to determine the credibility of the witnesses, and it could have reasonably found that Alejandro's testimony was not credible. (*Lee*, *supra*, 51 Cal.4th at p. 632.)[4]

## B.  CALCRIM No. 226

Defendant argues that his federal constitutional rights to due process and trial by jury were violated by the trial court's failure to instruct the jury regarding the bias of a witness who was promised a benefit in exchange for his testimony.

Here, the trial court instructed the jury pursuant to CALCRIM No. 226, which set forth the factors that the jury could consider in determining the credibility of the

---

[4]  Defendant also fails once again to acknowledge that this court must draw all inferences in favor of the judgment in reviewing the sufficiency of the evidence. (*Gonzales*, *supra*, 52 Cal.4th at p. 294.)  The jury could have reasonably concluded that defendant was not "unexpectedly attacked" by Hurtado, but that Hurtado delivered merely a glancing blow to defendant as defendant removed the nails from the gate latch. The jury could also have reasonably concluded that defendant's concealment of the knife in his sweater sleeve indicated that he did not want Hurtado to know he had a knife with which he intended to stab him.

witnesses.  However, the trial court did not instruct the jury with the following factor: "Was the witness promised immunity or leniency in exchange for his or her testimony?"

"A trial court has a sua sponte duty to 'instruct on general principles of law that are closely and openly connected to the facts and that are necessary for the jury's understanding of the case,' including instructions relevant to evaluating the credibility of witnesses.  [Citation.]" (*People v. Blacksher* (2011) 52 Cal.4th 769, 845-846.)  Penal Code section 1259 provides that an appellate court may "review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby."

In evaluating a witness's credibility, the jury may consider "[t]he existence or nonexistence of a bias, interest, or other motive."  (Evid. Code, § 780, subd. (f).)  The trial court must instruct the jury with all of the factors in CALCRIM No. 226 that are relevant based on the evidence.  (*People v. Rincon-Pineda* (1975) 14 Cal.3d 864, 883-884.)

Here, Argueta testified:  "I would like for everything to be fixed well, that justice be done correctly because I'm, like, not going to be here in California.  That's why I want justice to be done before I leave."  Near the end of his direct examination, the prosecutor and Argueta had this exchange:  "Q.  Mr. Argueta, when we first began your testimony this morning, you had said that you wanted to tell your statement in Spanish because you might not be in California. [¶]  Do you remember saying that? [¶]  A.  Yes. [¶]  Q.  And do you have a hold on you with I.N.S? [¶]  A.  Yes. [¶]  Q.  And are you scheduled for deportation? [¶]  A.  They're waiting for me when I finish this.  I didn't even know I was going to come here.  I only came here because . . . on the 22nd of August my mother died here. [¶]  And were you allowed to come to Hollister to have a last visit with your mom? [¶]  A.  Yes, they gave me permission to come and . . . be with her for about a half hour. [¶]  Q.  And since then have you remained in Hollister? [¶]  A.  No, they took me to Yuba, Yuba City, Sacramento, here by Sacramento. [¶]  Q.  Was that after you came to

22

visit your mom or before?  [¶]  A.  Both things, it was before and after because they were taking me there.  [¶]  Q.  And you had stated that you had seen some paperwork . . . when you were in custody up in Washington?  [¶]  A.  Yes, they took me there because my worker, yeah, Memo, the one in San Francisco, he told me that he didn't even know that they were going to bring me here.  And after he told me, They want you in Hollister, he said, You're going to go to Hollister; finishing in Hollister, you're coming back, and then I'll send you to Tacoma, Washington, again . . . .  [¶]  Q.  Are you aware of the paperwork that was filed by my office, by the district attorney's office, in order to keep you here to testify?  [¶]  A.  It wasn't very important, the paper she sent.  Because, here, this is state; and, there, that's federal.  [¶]  Q.  Now, are you testifying to gain any advantage to be able to stay in California?  [¶]  A.  No.  Why?  I'm already deported.  In any case, I have family there and everything.  My worker said in five years I can ask for a VISA and come back.  I'm fine with immigration now.  [¶]  Right now I am filing or petitioning to the 9th Circuit, they're waiting for a law to start in immigration, starting the law in immigration.  I have like 60 percent, like, possibility of getting permission there--"

Huggins testified that he interviewed Argueta at an immigration detention facility. Argueta told him that "he lost his appeal" and the prosecuting attorney "was helping him with the appeal letter."  Argueta explained to Huggins that "she wrote a letter on his behalf . . . [¶] . . . [t]o help him obtain a U-VISA."  "As [Argueta] tried to explain it to [Huggins], he wasn't quite clear; but he just told me it was like getting asylum for himself."  Huggins understood Argueta's definition of asylum meant that he would stay here until he testified at defendant's trial.  Huggins further testified:  "He believed that's what it meant to him, that he was going to be staying here in the United States coming back to San Benito County to testify and then getting out to go see his dying mother."  After speaking with Argueta, Huggins obtained general information "about the procedure he was talking about and what the U-VISA was all about."  He learned that "paperwork"

23

was required from the district attorney's office in San Benito County to ensure Argueta's presence at defendant's trial.

During the defense case, trial counsel and Argueta had this exchange: "Q. Did you tell Investigator Huggins if anyone was helping you with your deportation problems? [¶] A. Yes. [¶] Who was helping you? [¶] A. Well, not that they're helping me, but my attorney sent a letter here to Candace because I was already deported. But they can't deport anyone if they have a court appearance coming up; so the person has to go to court first, then get deported."

Thus, the record established that the prosecutor sent a letter to federal immigration authorities to ensure that Argueta not be deported until after he had testified at defendant's trial. Based on this evidence, no one could reasonably conclude that Argueta was promised immunity or leniency for his testimony. Accordingly, the trial court did not err in its jury instructions pursuant to CALCRIM No. 226.

### C. Jury Instructions on Murder

Defendant argues that the trial court erred in failing to instruct the jury pursuant to CALCRIM No. 522 that subjective provocation or unreasonable heat of passion can reduce first degree murder to second degree murder. Thus, he argues that he was denied his federal constitutional rights to due process, a fair trial, and to present a defense because the instructions that were given lessened the prosecution's burden of proof.

" '[T]he existence of provocation which is not "adequate" to reduce the class of the offense [from murder to manslaughter] may nevertheless raise a reasonable doubt that the defendant formed the intent to kill upon, and carried it out after, deliberation and premeditation.' [Citations.]" (*People v. Wickersham* (1982) 32 Cal.3d 307, 329, overruled on another ground in *People v. Barton* (1995) 12 Cal.4th 186, 200-201.) CALCRIM No. 522 provides that provocation that is insufficient to reduce a murder to

24

manslaughter may reduce a murder from first to second degree.[5] This instruction pinpoints a defense theory and must be given only on request and when it is supported by substantial evidence. (*People v. Rogers* (2006) 39 Cal.4th 826, 877-878.) Though requested by trial counsel, the trial court did not give CALCRIM No. 522 in the present case. When the trial court errs by failing to give a requested defense pinpoint instruction, we must determine whether it is reasonably probable that the jury would have returned a different verdict absent the error. (*People v. Earp* (1999) 20 Cal.4th 826, 886-887 (*Earp*).)

Here, the evidence of provocation was very weak. Defendant had been told repeatedly not to come to Hurtado's house. When defendant was attempting to trespass onto the Hurtado property on his third visit, Hurtado brushed his forearm with a steel bar. When defendant entered the property and threw himself to one knee, Hurtado did not threaten him with the bar. After the stabbing, defendant said, "I got him, I got him" and shortly thereafter denied any problems with Hurtado. Thus, defendant's behavior was inconsistent with someone who had stabbed another because he had acted rashly and under the influence of an intense emotion that obscured his reasoning or judgment.

More importantly, the jury necessarily resolved the issue of defendant's mental state under other properly given instructions. The trial court instructed the jury pursuant to CALCRIM No. 521, which required it to determine the degrees of murder, if it decided that defendant had committed murder. The trial court instructed the jury that in order to find that defendant committed first degree murder it was required to find whether the prosecutor proved beyond a reasonable doubt that defendant acted willfully and with

---

[5] CALCRIM No. 522 states: "Provocation may reduce a murder from first degree to second degree [and may reduce a murder to manslaughter]. The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. [Also consider the provocation in deciding whether the defendant committed murder or manslaughter.]"

premeditation and deliberation. The trial court then defined these terms: "The defendant acted willfully if he intended to kill. The defendant acted deliberately if he carefully weighed the considerations for and against his choice and knowing the consequences decided to kill. [¶] The defendant acted with premeditation if he decided to kill before committing the act that caused death. The length of time a person spends considering whether to kill does not alone determine whether the killing is deliberate or premeditated. [¶] The amount of time required for deliberation and premeditation may v[a]ry from person to person and according to the circumstances. A decision to kill made rashly, impulsively or without careful consideration is not deliberate and premeditated. [¶] On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection; not the length of time." The jury was also instructed that, in the event that it did not unanimously agree that the prosecution had met its burden, the killing was second degree murder and it was required to find that defendant was not guilty of first degree murder. Thus, the jury was aware that if defendant acted rashly or impulsively in stabbing Hurtado, he was guilty of second degree murder. However, by convicting defendant of first degree murder, the jury rejected the conclusion that defendant was subjectively provoked to the extent that he could not premeditate and deliberate. Accordingly, it is not reasonably probable that the jury would have returned a verdict of second degree murder if it had been instructed with CALCRIM No. 522. (*Earp*, *supra*, 20 Cal.4th at p. 887.)

## D.  Ineffective Assistance of Counsel

Defendant contends that he was deprived of his federal constitutional right to the effective assistance of counsel in numerous respects.

### 1.  Legal Principles

"Under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has the right to the

assistance of counsel." (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) That right "entitles the defendant not to some bare assistance but rather to *effective* assistance." (*Ibid.*) But the "Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." (*Yarborough v. Gentry* (2003) 540 U.S. 1, 8.)

"To prevail on a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense. [Citations.] Counsel's performance was deficient if the representation fell below an objective standard of reasonableness under prevailing professional norms. [Citation.] Prejudice exists where there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. [Citation.]" (*People v. Benavides* (2005) 35 Cal.4th 69, 92-93 (*Benavides*).) However, "'[if] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation,' the claim on appeal must be rejected." (*People v. Wilson* (1992) 3 Cal.4th 926, 936.)

## 2. Cross-examination of Argueta

Defendant contends that trial counsel failed to effectively cross-examine Argueta, because she did not impeach him with discrepancies between his testimony at trial and his testimony at the preliminary hearing.

At the preliminary hearing, Argueta demonstrated the relative positions of Hurtado and defendant immediately before the stabbing. Argueta portrayed defendant and Patrick Palacios, the prosecutor, portrayed Hurtado. The trial court described the positions as follows: "Mr. Palacios and Mr. Argueta are facing each other. Mr. Argueta is on, looks like, his right knee with his left knee up, and he's in a kneeling position. Mr. Palacios is standing upright, portraying the bar in his right hand, his right hand extended basically skyward."

27

At trial, Argueta repeated the demonstration in which he portrayed defendant and Palacios portrayed Hurtado. Argueta "was taking the same crouching position with the forearm up, similar to around his eyes or forehead." The record does not reflect the position taken by Palacios, only that Argueta instructed him to "[j]ust raise the right hand only, like this. He had the bar like that and he was facing the front."

During her cross-examination of Argueta at trial, trial counsel asked him whether "the demonstration that [he] did in court at the preliminary hearing on September 25, 2008, was that the same demonstration that [he] did in court yesterday?" Argueta answered affirmatively.

During the defense case, trial counsel presented testimony from LaForge, who represented defendant at his preliminary hearing. LaForge testified regarding the demonstration of the relative positions of defendant and Hurtado, which was presented at the preliminary hearing by Argueta and Palacios. According to LaForge, Palacios, who portrayed Hurtado, held the simulated steel bar "straight up." The trial court also admitted into evidence the pages from the preliminary hearing transcript in which the relative positions of Argueta and Palacios were described.

During closing argument, trial counsel focused on the discrepancy between Argueta's preliminary hearing description of where Hurtado held the steel bar and his trial description. "And remember Carlos Hurtado? It's really hard for me to sit at this counsel table with Carlos Hurtado -- I'm sorry -- Carlos Argueta. He stood up there with Deputy District Attorney Patrick Palacios -- I'm so mad. I'm sorry. I'll slow down. [¶] When he gave you that demonstration and Patrick Palacios came into this courtroom and stood in front of you and he said the demonstration at the preliminary hearing was that [Hurtado] had the bar like this. He showed you a limp wrist. That was totally false. That was totally a lie. [¶] That's why I brought Greg LaForge in here yesterday to tell you what happened at that preliminary hearing. Greg told you Patrick Palacios is the same guy that stood in front of you with the limp wrist, with the chrome bar. That's what he

28

did in 2008 in front of Judge Sanders. [¶] He stood with it like this. I don't know why he did that. I don't know why he came in here and told you that, but that's a lie. And you're going to see the transcript, and it's in evidence. [¶] And you can look at this. Judge Sanders read into the record what the demonstration was at the preliminary hearing. And that little charade that they put out here in front of you, that was a lie."

Defendant argues that trial counsel's failure to confront Argueta directly constituted incompetence, because she "did not provide the jury with any basis for deciding which demonstration was the accurate one." He asserts that trial counsel "could, and did, repeatedly claim that the demonstration at the preliminary examination was accurate and the one at trial was 'totally a lie,' but as the court instructed the jury, '[n]othing the attorneys say is evidence.' [Citations.] That instruction explicitly, and correctly, precluded the jury from taking [trial counsel's] word for it that the hand-over-head demonstration at the preliminary examination represented what actually happened and the 'limp wrist' demonstration at trial was 'totally a lie.' The jury could not conclude that Argueta had lied at trial and told the truth at the preliminary examination simply on counsel's say-so."

Here, trial counsel may have made a tactical decision not to cross-examine Argueta about the preliminary hearing demonstration, because she did not know what his response would be. He could have testified that the demonstration at trial was the correct one and explained that he had not been focusing on the position of Palacios's hand during the demonstration at the preliminary hearing. In any event, we disagree with defendant that the jury had no basis for determining that Argueta had either lied at the preliminary hearing or was lying at trial, and thus was not a credible witness. LaForge's testimony and the admission of the preliminary hearing transcript established that the demonstration at the preliminary hearing was different from the one presented at trial. This evidence served as the basis for trial counsel's argument that Argueta lied at trial. Moreover, the trial court instructed the jury regarding the prior statements of witnesses: "You've heard

29

evidence of statements that a witness made before the trial. If you decide that the witness made that or those statements, you may use that or those statements in two ways; one, to evaluate whether the witness's testimony in court is believable; and, two, as evidence that the information in that or those earlier statements is true." Thus, the jury had a basis for concluding that Argueta lied at either the preliminary hearing or at trial, and concluded that his demonstration at trial was the truth.

Defendant next contends that trial counsel rendered ineffective assistance by failing: (1) to cross-examine Argueta at trial regarding his preliminary hearing testimony that he had not seen the stabbing; and (2) to impeach his trial testimony with a police report which included statements by Argueta that he had not seen the stabbing.

Defendant focuses on the following colloquy at the preliminary hearing: "Q. Did you see Mr. Hurtado get stabbed? [¶] A. Huh? [¶] Q. Did you see him get stabbed? [¶] A. Yeah. I could see, like, you know, he had him here. [¶] Q. Okay. Now, you talked to the officers that night; correct? [¶] A. (Nods head.) [¶] Q. You were being truthful with the officers; correct? [¶] A. Yeah. [¶] Q. You wouldn't have lied to the officers that night; right? [¶] A. No. [¶] Q. So everything you told the officers that night was true and to the best of your recollection; correct? [¶] A. Yeah. [¶] Q. So if an officer stated in her report that Carlos stated that he did not witness a stabbing, but heard Alex say, 'They stabbed me,' that would be correct? Right? [¶] A. What? [¶] Q. I'm sorry. That Carlos stated he did not witness the stabbing, but heard Alex say 'They stabbed me,' do you remember telling Officer Pacheco that? [¶] A. 'They'? [¶] Q. Yes. [¶] A. 'They'? No. [¶] That would be wrong if she had that in her report? [¶] Yeah. 'They'? Because, you know, it wasn't like people stab him, it's just like one people. [¶] Q. That would be a wrong statement if Officer Pacheco put that in her report? [¶] A. 'They'? [¶] Q. Do you remember telling Officer Pacheco that you observed Alex and my client pushing each other? [¶] A. They weren't pushing each other. [¶] Q. That's wrong too? [¶] A. No, that's wrong too, because I never say

30

pushing each other. [¶] Q. So if that's in an officer's report, that is wrong; is that correct? [¶] A. Yeah."

Here, one could reasonably interpret Argueta's preliminary hearing testimony as establishing that he did see the stabbing and that the police officer was mistaken in stating that he did not see the stabbing. Thus, trial counsel could have reasonably concluded that this evidence would not have benefited the defense. Moreover, even assuming it was incompetence for failing to introduce this evidence, defendant has failed to establish prejudice. During her cross-examination of Argueta at trial, trial counsel asked: "And you told us yesterday that right before the stabbing, you turned your back on [defendant] and [Hurtado] and you were looking at the men near the mailbox; is that true?" Argueta answered affirmatively. Since Argueta's own testimony impeached his prior testimony that he had seen the stabbing, it is not reasonably probable that the result would have been more favorable to defendant if trial counsel had impeached Argueta with his preliminary hearing transcript or the police report.

Defendant also argues that trial counsel rendered ineffective assistance, because she did not confront Argueta with his preliminary hearing testimony that he saw Hurtado swing the steel bar twice at him. He argues that "[b]ecause the sole defense theory was perfect self-defense, it was crucially important that the jury understand the factual basis for [his] belief that if he did not use deadly force to stop Hurtado's attack, Hurtado would continue swinging the bar until he managed to seriously injure or kill [him]."

At the preliminary hearing, Argueta testified that when defendant "tried to open the gate," Hurtado "got mad, and he went, you know, to him, like, 'What the fuck?' And [he] tried to open the gate, you know, and [Hurtado], you know, hit him in the hand," with "a smooth iron bar." After defendant reached over the gate, Hurtado told him to leave. At that point, defendant responded that he wanted to fight. Hurtado then "tried to hit him again, but he don't. He just like, you know, he tried and hit the fence. He just hit

31

the fence, you know, and then, you know, he started to leave, but he was, like, all mad and --"

Even assuming that trial counsel's performance was deficient for failing to elicit testimony from Argueta at trial that Hurtado tried to hit defendant twice, and impeaching him with his preliminary hearing testimony if he denied it, it is not reasonably probable that the jury would have returned a more favorable verdict for defendant if it had learned Hurtado hit defendant once and missed hitting him once.

### 3. Cross-examination of Dr. Hain

Defendant contends that trial counsel's cross-examination of Dr. Hain was deficient.

Dr. Hain testified that Hurtado could not have had his hands over his head immediately before he was stabbed, because "when the arms are raised up, the item of clothing, the outer clothing rises up with the shoulders; and so you would expect the stab wound to be much lower. So the higher the arms get, the . . . lower the stab wound would be on the outer clothing." Trial counsel's cross-examination of Dr. Hain consisted of the following: "Q. Good afternoon, Mr. Hain. [¶] A. Good afternoon. [¶] Q. Other than the stab wounds and medical interventions, there were no other injuries on Mr. Hurtado's body; is that correct? [¶] A. As I recall, I don't think there were. There were none that I observed. That's correct. [¶] Q. Thank you. And after this wound, are you saying Mr. Hurtado would have had approximately ten seconds of consciousness after suffering this wound? [¶] A. Yes, I believe so. [¶] Q. Thank you. Nothing further."

Defendant argues that "the destructive force of Hain's testimony is illusory, because he did not address the question of whether Hurtado could have had one hand over his head at the time he was stabbed." (Italics omitted.) He also points out that trial counsel did not "probe into how Hain developed his theory of determining arm position of a stabbing victim by analyzing the tears on the outer clothing, whether this analysis was accepted by other practitioners in his field, whether it was confirmed experimentally

32

or published in any peer-reviewed journal, whether it was equally applicable to all types of outer garments, whether the effect might be less pronounced or totally absent in the case of a loose or baggy outer garment, or whether he had performed the experiment with Hurtado's actual body and sweatshirt or merely extrapolated from personal experience with his own clothing, as he did in court. . . . ['[A]s you can see on me, . . . when I raise my arms, my items of clothing, which of court is different from [Hurtado's], goes up maybe almost a foot, ten inches']."

Defendant has failed to establish that a reasonably competent attorney would have cross-examined Dr. Hain regarding these issues, because he speculates that Dr. Hain's responses would have been favorable to the defense. Defendant argues, however, that even if Dr. Hain had claimed that the same analysis applied to raising one arm and that his testimony was based on a well-established forensic technique, trial counsel's cross-examination on these issues would have "would have emphasized to the jury that they were not required to accept Hain's conclusion at face value merely because he had been designated an expert." But the trial court instructed the jury that it was "not required to accept [expert opinions] . . . as true and correct" and that it could "disregard any opinion" that it found "unbelievable, unreasonable or unsupported by the evidence." In addition, the defense presented its own expert, Dr. Posey, who testified that based on the position and path of the knife wound, Hurtado was leaning forward and "had to have his hand up extended" when he was stabbed. Accordingly, we reject defendant's argument.

### 4. Failure to Request an Admonition

Defendant contends that trial counsel's failure to request an admonition regarding Argueta's comments which drew attention to defendant's failure to testify constituted incompetence.

During the prosecutor's redirect examination of Argueta, the following exchange occurred: "Q. Could you see anything coming out of the sleeve? [¶] A. No, I didn't see anything. [¶] Q. Did you see a knife? [¶] A. Well, after the incident happened, he's

33

the one who's here present. [¶] Q. Mr. Argueta? [¶] A. He knows what he had done." Trial counsel then objected to Argueta's answer on the ground that it was nonresponsive. The trial court, without ruling on the objection, directed Argueta to answer the question. Argueta responded, "At that instance, I did not see it."

Defendant acknowledges that Argueta's response was not *Griffin* error. *Griffin v. California* (1965) 380 U.S. 609 held that "the Fifth Amendment, in its direct application to the Federal Government, and in its bearing on the States by reason of the Fourteenth Amendment, forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." (*Id.* at p. 615.) However, defendant argues that Argueta's comment was "highly prejudicial," because "it imposed a penalty on [him], in the form of the jury's suspicion that he must have something to hide, for exercising his constitutional privilege not to testify." We disagree.

In considering *Griffin* error claims, courts must first determine whether there is "a reasonable likelihood that any of the comments could have been understood, within its context, to refer to defendant's failure to testify." (*People v. Clair* (1992) 2 Cal.4th 629, 663.) Here, trial counsel could have reasonably concluded that it was not reasonably likely that the jury understood Argueta's comment that "[h]e knows what he had done" as a comment on defendant's failure to testify, particularly since the defense had not yet presented its case. Moreover, the trial court instructed the jury at the conclusion of the case pursuant to CALCRIM No. 355: "The Defendant's Right Not to Testify. A defendant has an absolute constitutional right not to testify. He or she may rely on the state of the evidence and argue that the People have failed to prove the charges beyond a reasonable doubt. [¶] Do not consider for any reason at all the fact that the defendant did not testify. Do not discuss that fact during your deliberations or let it influence your decision in any way." We must presume that the jury followed the trial court's instructions. (*People v. Thomas* (2011) 51 Cal.4th 449, 487 (*Thomas*).) Accordingly, we find that defendant has failed to establish that trial counsel's performance was deficient.

34

### 5. Failure to Object to Prejudicial and Irrelevant Evidence

Defendant argues that trial counsel rendered ineffective assistance when she failed to object to inadmissible evidence at trial.

The prosecution introduced photographs of several items from defendant's jail cell, including a bed sheet, a writing tablet, and a beanie. The bed sheet had "187 Case Prison" written on it in several places as well as "1985." "187" is the Penal Code section for murder and 1985 is the year that defendant was born. The writing table had "187 Case" and defendant's nickname "Pepe" written on it. "187" was also written on the beanie.

Defendant contends that trial counsel's failure to bring a motion to exclude this "highly prejudicial" evidence was ineffective assistance of counsel.

"'Relevant evidence' means evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) The trial court has discretion to exclude evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

We disagree with defendant that this evidence was irrelevant. Evidence of defendant's possession of items that were marked with his date of birth, nickname, and the Penal Code section for murder shortly after the killing was probative on whether he committed a murder. Sergeant Pershall testified that defendant was "not necessarily" confessing to the crime, but was "bragging." Whether defendant was bragging about being charged with murder or about having committed a crime was a factual question for the jury to decide.

Moreover, trial counsel could have reasonably concluded that the trial court would not have excluded the evidence under Evidence Code section 352. "The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the

35

prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging."' [Citation.]" (*People v. Karis* (1988) 46 Cal.3d 612, 638.) Here, the evidence was relevant and did not tend to evoke an emotional bias against defendant. Thus, trial counsel was not incompetent for failing to make a motion to exclude the evidence when it would have been futile. (*People v. Lewis* (1990) 50 Cal.3d 262, 289.)

Defendant also claims trial counsel was incompetent for failing to object to Sergeant Pershall's testimony indicating that defendant had previously been in jail.

Sergeant Pershall testified that on the night of the stabbing, he went "to the county jail to obtain a photo lineup" for use in obtaining eyewitness identification of defendant. He had some difficulty in assembling the photo lineup. "A. I was unable to find a -- I was informed of [defendant's] current hair style, and I -- the difficulty was I could not find a photo with his current hair style at jail. [¶] Q. . . . How do you prepare a photo lineup? [¶] A. I take six photographs, cover up any identifying information, try to get similar looking individuals, and put them together on a single sheet of paper. [¶] Q. Were you able to find any similar with that style hair? [¶] A. With that hair style, no. [¶] Q. So what did you do? [¶] A. So I used a photograph that they had with [defendant's] hair slicked back. [¶] Q. And were you able to find five similar? [¶] A. Yes, I was."

Defendant argues that evidence that he "had been in jail was not probative of anything relevant but was highly prejudicial, and was therefore subject to exclusion under Evidence Code section 352. It was also evidence of prior bad conduct, and therefore inadmissible to prove his conduct on the occasion relevant at trial. (Evid. Code, § 1101,

36

subd. (a).)" Trial counsel could have reasonably concluded that an admonition would have drawn more attention to the inadmissible evidence. In any event, since the references were fleeting and not exploited by the prosecution, and given the evidence against defendant, it is not reasonably probable that defendant would have received a more favorable verdict if trial counsel had objected to Sergeant Pershall's references to looking for defendant's photograph at jail and requested an admonition.

Defendant next focuses on the testimony of Scalmanini, Hurtado's sister.

Scalmanini testified extensively about Hurtado and their family. Scalmanini was a speech language pathologist and Hurtado's other siblings had similarly respectable jobs. Two of his siblings had master's degrees and Hurtado was a high school graduate with "some" college. Hurtado's parents were long-time residents of Hollister and Hurtado lived with them. Hurtado was a "really good brother," "really nice," "respectful" toward the women in the family, and "had a good sense of humor." Hurtado loved to read, and particularly enjoyed a book called *The Secret*, which contained inspirational spiritual and philosophical messages that Hurtado frequently discussed with Scalmanini. Scalmanini and Hurtado had a "special bond" because she had taken care of him when he was a baby. Hurtado was "fantastic" with his nieces and nephews. Scalmanini did not know Hurtado's friends and described his work history as "sporadic." She and one of her sisters learned of Hurtado's death while attending a Pop Warner football event in Florida and they were unable to return home immediately. A month before his death, the family chartered a bus to attend a relative's wedding where a family member took a photograph of Hurtado. This photograph, along with one of Hurtado's mother, was shown to the jury. Hurtado also liked to watch television, listen to music, be with his friends, and write in his journal.

When the prosecutor started to ask Scalmanini if she had gone through Hurtado's journal and picked out some passages, trial counsel said, "Um -- " at which point the trial

37

court interrupted her and said, "[C]an we get to what we're talking about here. There are instructions that . . . [¶] . . . [¶] . . . we're getting close to violating."

The prosecutor then asked Scalmanini whether she was aware of Hurtado's drug issues. She answered affirmatively, but she also testified that she had never seen him take drugs or observed him while he was under the influence. Scalmanini and Hurtado had also talked about him straightening out his life. The following exchange then occurred: "Q. Is there anything of that that you can share? [¶] A. I have a journal, but we did talk. We did talk on a few occasions about, you know, about getting better and getting on the right track. [¶] Q. Just prior to his death, a month or so before his death, had he talked to you about a career path? [¶] A. Yes. [¶] Q. And what was that? [¶] A. He wanted to go into the National Guard. [¶] Q. And you had talked about his sense of humor. Do you have an example? [¶] A. I do. [¶] Q. What is that? [¶] A. I have it in -- well, in the journal. [¶] THE COURT: I get the impression, Counsel, that you're not listening to me. [¶] [THE PROSECUTOR]: I'm sorry, Judge. [¶] THE COURT: You know what I'm talking about. Move on to the facts of this case. This is an appeal to sympathy, which we all feel and which the jury is not allowed to consider in making their decision, if you would read the instructions. Now, move on. [¶] [THE PROSECUTOR]: Q. Okay. Do you know if [Hurtado] has ever attended any drug rehabilitation? [¶] A. Not to my knowledge. [¶] [THE PROSECTUOR]: Thank you. I have nothing further."

Defendant argues that competent counsel would have inquired prior to trial as to who Scalmanini was and why she was being called, insisted upon an offer of proof as to what her testimony would be, and moved to exclude it. Alternatively, competent counsel would have objected on relevance and Evidence Code section 352 grounds when Scalmanini testified regarding her siblings' occupations. Instead, trial counsel failed to make any objections and did not move to strike the offending testimony. Defendant argues that this testimony "inflamed the jury's passions and prejudices" against him.

38

Here, a competent counsel would have either moved to exclude the evidence prior to trial or objected to it at trial on grounds of relevancy and undue prejudice. However, in our view, defendant was not prejudiced by trial counsel's performance. The jury was informed at the time of Scalmanini's testimony that it was not allowed to consider sympathy in making its decision. Moreover, during her closing argument, trial counsel reminded the jury that its decision could not be based on sympathy. "You know, the Hurtados, I can tell by looking at those photos that they take pride in their home. And [Scalmanini] told us they moved to this neighborhood because they believed it was a good area. [¶] And I believe everything that [Scalmanini] told us about [Hurtado]. You know, he was a good guy. He was loved. He loved his family. And, you know, and I understand. And [Scalmanini] needed to come to court, and she needed for you to hear that; and she needed to tell us that. And I understand. [¶] And a courtroom's a horrible, horrible place to have to come and share your pain. You know, we see it every day. But the fact remains, [Hurtado] was high on meth that night when he came out swinging that chrome bar at [defendant]. He was high on meth. He was sky high on meth. [¶] And as Judge Schwartz told you, this is a court of law and no matter how tragic an incident is and no matter how much sorrow it causes us, you know, we don't make decisions based on sympathy. We apply the law." The trial court also instructed the jury at the conclusion of the case: "Do not let bias, sympathy, prejudice or public opinion influence your decision." This court must presume that the jury followed the trial court's instructions. (*Thomas*, *supra*, 51 Cal.4th at p. 487.) Based on this record, it is not reasonably probable that the outcome would have been more favorable to defendant but for trial counsel's failure to object to Scalmanini's testimony. (*Benavides*, *supra*, 35 Cal.4th at p. 93.)

### 6. Failure to Object to Prosecutorial Misconduct

Defendant next contends that trial counsel's failure to object to prosecutorial misconduct constituted ineffective assistance of counsel.

Captain Reynoso testified that when he contacted defendant on the morning of December 4, 2007, defendant denied having any injuries and having been hit anywhere. Based on this testimony, the prosecutor repeatedly stated during argument that defendant had not been injured in the fight with Hurtado. The prosecutor also argued: "The Defendant acted in imperfect self-defense if, one, the Defendant actually believed that he was in [imminent] danger of being killed or suffering great bodily injury; and, two, the Defendant actually believed that the immediate use of deadly force was necessary to defend against the danger; but, three, at least one of those beliefs was unreasonable. [¶] Belief in future harm is not sufficient no matter how great or how likely the harm is believed to be. In evaluating the Defendant's beliefs, consider all the circumstance[s] as they were known and appeared to the Defendant. [¶] Great bodily injury means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm. The People have a burden of proving beyond a reasonable doubt that the Defendant was not acting in [im]perfect self-defense. If the People have not met this burden, you must find the Defendant not guilty of murder. [¶] So given the facts, could the Defendant actually believe he was in [imminent] danger of being killed or suffering G.B.I.? Again, going back to the use of that bar. The use of the bar was not used in such a manner that it meets this element. It was not used so that the Defendant feared being killed or great bodily injury. His lack of injuries supports that."

Defendant contends that the prosecutor misstated the law by "suggest[ing] to the jury that as a matter of law, petitioner could only have had a reasonable belief that Hurtado was about to seriously injure or kill him, in the sense required as an element of self-defense, if Hurtado actually *did* injure him."

It is misconduct for the prosecutor to misstate the law. (*People v. Huggins* (2006) 38 Cal.4th 175, 253, fn. 21.) "'[I]t is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements. [Citations.]' [Citation.]"

40

(*People v. Hill* (1998) 17 Cal.4th 800, 829-830, overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.)

Read in context, we do not interpret the prosecutor's statements as claiming that the imperfect self-defense doctrine applied, as a matter of law, only if defendant suffered an injury. First, the prosecutor correctly stated the law on imperfect self-defense. Second, the prosecutor then inferred from the evidence that defendant had no injuries that Hurtado had not used the steel bar in a way which would have led defendant to actually believe that he was in danger of being killed or suffering great bodily injury, and thus she argued that the imperfect self-defense doctrine did not apply. Trial counsel could have reasonably concluded that the prosecutor did not commit misconduct.

Defendant next argues that trial counsel was incompetent for failing to object to the prosecutor's shifting of the burden of proof of the elements of voluntary manslaughter.

The prosecutor recited the elements of heat-of-passion voluntary manslaughter as set forth in CALCRIM No. 570, and ended her recitation with: "The People have the burden of proving beyond a reasonable doubt that the Defendant did not kill as a result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty. [¶] So it sets up three elements that must be found, that must be met, in order for the Defendant to be found not guilty." The prosecutor then referred to the facts of the case to argue: (1) the defendant was not provoked; (2) defendant did not act rashly and under the influence of intense emotion that obscured his reasoning or judgment; and (3) the provocation would not have caused a person of average disposition to act rashly and without deliberation.

Defendant argues that the prosecutor's comment, "So it sets up three elements that must be found, that must be met, in order for the Defendant to be found not guilty" "interprets CALCRIM No. 570 as instructing that the defendant is guilty of murder by default, and that the jury can only find him guilty of voluntary manslaughter instead if

41

certain elements are found, met, or proved." He thus claims that "[t]he unavoidable implication was that the defendant was required to prove the elements of voluntary manslaughter, which is the diametric opposite of what the law says."

We do not interpret the prosecutor's summary as "turn[ing] the presumption of innocence on its head." The prosecutor forgot to state "of murder" after "not guilty" when reciting the elements of heat-of-passion voluntary manslaughter. She did not argue that the defendant had the burden of proving that he was not guilty or that he was not presumed innocent. Moreover, she then argued that the facts did not establish the elements of heat-of-passion voluntary manslaughter, which was the prosecution's burden to prove. Trial counsel did not render ineffective assistance for failing to object to the prosecutor's argument.

### 7. Omission of Crucial Evidence in Closing Argument

Defendant claims that trial counsel omitted mentioning crucial testimony in her closing argument.

Defendant first points out that trial counsel failed to mention some of Alejandro's testimony: defendant told the others "[t]hat he was all scared, that he stabbed him"; that Alejandro had seen Hurtado hit defendant with the steel bar more than once; and defendant was "trying to block him" and "trying to cover himself."

Here, trial counsel argued that defendant stabbed Hurtado in self-defense and focused on the forensic evidence and expert testimony, that is, the position of Hurtado's arm when he was stabbed and the lack of hilt marks on his body, the level of methamphetamine in Hurtado's body at the time of death, and the behaviors of chronic users of methamphetamine. She also challenged the credibility of Argueta, Martinez, and Dr. Hain and the failure of the police to adequately investigate the case. As to Alejandro, she noted that he "told us that [he] saw [Hurtado] hitting [defendant] with the chrome steel bar." She also referred to Alejandro's testimony that "they were scared in the bedroom [of defendant's house]" and defendant "said he stabbed him." Trial counsel

42

further emphasized that "the best witness to this stabbing [was] Alejandro Covian. Every single thing Alejandro said made sense." She then summarized Alejandro's testimony regarding the purpose of each of defendant's visits to the Hurtado house that night. Though Alejandro's testimony that defendant was trying to prevent Hurtado from hitting him was favorable to the defense, it was not essential for a jury's understanding of the defense theory. Accordingly, trial counsel was not incompetent for failing to emphasize the above-referenced portions of Alejandro's testimony.

Defendant next focuses on trial counsel's failure to reference Martinez's favorable testimony, that is, that "the confrontation between [defendant] and Hurtado went on for a considerable time."

Martinez testified that she heard wrestling sounds by the gate. She looked around the side door, and she saw that the gate was open, and Hurtado and defendant were fighting. The fight then moved out to the driveway and front yard. However, Martinez also testified that she saw Hurtado trying to hit defendant over the fence when he was trying to open the gate, but she never saw Hurtado try to hit him after the gate was open. When the two men were "both hugging on to each other," Hurtado's hand was not raised. Martinez also denied ever hearing that night that defendant tried to purchase a bag of methamphetamine from Hurtado or that defendant argued about the quality or quantity of methamphetamine. She also denied seeing Hurtado give defendant a bag of methamphetamine that night. In addition, Martinez testified that Hurtado called her that night and asked her for drugs, and that she had been using methamphetamine for over 20 years. Moreover, Martinez's testimony about when she arrived at the Hurtado house was incorrect.

Here, trial counsel emphasized the expert testimony that Hurtado was a chronic methamphetamine user who was under the influence at the time of his death. Focusing on the characteristics of chronic methamphetamine users, she argued that he was the aggressor in the confrontation. Given that Martinez was also a chronic

43

methamphetamine user and most of her testimony was not favorable to the defense, trial counsel could have reasonably decided to reference only that portion of her testimony which was corroborated by Argueta. Thus, trial counsel noted that both Argueta and Martinez testified that Hurtado "brought that weapon into that fight," and they heard wrestling and defendant saying "Why are you hitting me? Why are you hitting me?" Trial counsel then focused on Martinez's addiction to methamphetamine and Dr. Fithian's testimony that chronic methamphetamine users have an altered sense of reality, and pointed out the discrepancies in her testimony. Trial counsel might have reasonably concluded that mentioning Martinez's testimony as to the length of the fight would have been easily rebutted by the prosecutor's reliance on defense expert testimony. Accordingly, defendant has failed to establish that trial counsel was incompetent in failing to reference a portion of Martinez's testimony.

### 8. Failure to Address CALCRIM No. 3471 in Closing Argument

Defendant contends that trial counsel's failure to address CALCRIM No. 3471 during her closing argument "effectively withdrew the justification of self-defense from the jury's consideration," and thus she rendered ineffective assistance. He further argues that "[b]y failing to inform the jury why the prosecutor's argument was wrong, [trial counsel] eliminated any possibility that the jury would acquit [him] on the basis that he had acted in self-defense," which amounted to withdrawal of his only defense.

The trial court instructed the jury with CALCRIM No. 3471: "Right to Self-defense, Mutual Combat or Initial Aggressor. A person who engages in mutual combat or who is the first one to use physical force has the right to self-defense only if, one, he actually and in good faith tries to stop fighting; and, two, he indicates by word or conduct to his opponent in a way that a reasonable person would understand that he wants to stop fighting and that he has stopped fighting; and, three, he gives his opponent a chance to stop fighting. [¶] If a person meets these requirements he then has a right to self-defense if the opponent continues to fight. If you decide that the defendant started the fight using

44

non-deadly force and the opponent responded with sufficient and sudden deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to stop fighting."

Here, the prosecutor stated "I think [CALCRIM No. 3471] probably best describes the difference between the way the defense sees the case and the way the People see the case." After quoting CALCRIM No. 3471, she argued: "[Hurtado] stops. He's standing right there. He even looks over at [Argueta]. He's not fighting. What about the defendant? [¶] While [Hurtado] is standing there, the Defendant's in a crouching position. When [Hurtado] looks away, the Defendant comes up and stabs him. [Hurtado] did not use sudden and deadly force. The use of that bar -- he did use the bar. I mean, there's no getting around it. He used that bar, but it was not sudden with deadly force. [¶] Who used sudden and deadly force? The Defendant. The Defendant comes out of the blue, in essence, has that knife hidden in his sleeve, comes out and stabs [Hurtado]. The Defendant is the one who is the aggressor."

Defendant argues that "[t]here was evidence that at some point prior to stabbing Hurtado, [he] went down onto the ground in a kneeling position. . . . Kneeling is a submissive posture which could easily be understood by a reasonable person to indicate that the person doing it wanted to stop fighting. [Trial counsel] never mentioned in her closing argument that [he] might well have intended to withdraw from the fight by kneeling on the ground, and might therefore have been justified in defending himself when Hurtado continued the fight by swinging the steel bar at him." However, any argument that defendant was trying to communicate that he wanted to withdraw from the fight by kneeling on the ground was not supported by evidence of his concealment of a knife inside his sweater sleeve. Thus, trial counsel may have made a reasonable tactical decision not to respond to the prosecutor's argument.

Defendant also argues that trial counsel never mentioned Alejandro's testimony which established that Hurtado had hit him multiple times with the steel bar, and

45

Dr. Posey's testimony that the bar could crush a skill with the application of only moderate force. As previously discussed, trial counsel argued that the evidence established: Hurtado was a chronic methamphetamine user; Hurtado "came out of that garage swinging that chrome bar" at defendant; prosecution witnesses heard defendant ask "Why are you hitting me? Why are you hitting me?"; Hurtado's arm was raised when he was stabbed; and "[w]hen [defendant's] down on the ground, he makes one swift motion to stop the attack." Thus, trial counsel portrayed the confrontation as entirely one-sided and the only force used by defendant was a single stab while he was on the ground and Hurtado was crouched above him swinging the steel bar. Though referring to evidence that Hurtado hit defendant multiple times with the steel bar and that the steel bar could have crushed defendant's skull would have strengthened trial counsel's argument, it was not incompetence to fail to reference this evidence.

### 9. Failure to Address Lesser Charges in Closing Argument

Defendant contends that trial counsel's failure to discuss any lesser offenses during her closing argument constituted ineffective assistance.

The only defense theory which trial counsel argued in her closing argument was perfect self-defense. Though the jury was instructed on second degree murder, imperfect self-defense voluntary manslaughter, and heat-of-passion voluntary manslaughter, she did not allude to these lesser offenses.

Trial counsel's decision of how to argue to the jury after the evidence has been presented is an inherently tactical decision. (*People v. Freeman* (1994) 8 Cal.4th 450. 498.) "[D]eference to counsel's tactical decisions in his [or her] closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage. Closing arguments should 'sharpen and clarify the issues for resolution by the trier of fact,' [citation], but which issues to sharpen and how best to clarify them are questions with many reasonable answers. Indeed, it might sometimes make sense to forgo closing argument altogether. [Citation.]" (*Yarborough v. Gentry*, *supra*, 540 U.S. at p. 6.)

"Reversals for ineffective assistance of counsel during closing argument rarely occur; when they do, it is due to an argument against the client which concedes guilt, withdraws a crucial defense, or relies on an illegal defense." (*People v. Moore* (1988) 201 Cal.App.3d 51, 57.)

Here, trial counsel did not concede guilt, withdraw a crucial defense, or rely on an illegal defense. Trial counsel could have argued both perfect self-defense and, alternatively, that defendant was guilty of only lesser offenses than first degree murder. However, given the deference to tactical decisions in closing argument, defendant has failed to establish that trial counsel's decision fell below the standard of professionally reasonable conduct.

## 10. Prejudice

Defendant also contends that he was prejudiced by multiple acts of deficient performance.

We have concluded that trial counsel's representation was deficient under prevailing professional norms when she failed: (1) to ask Argueta whether, as he testified at the preliminary hearing, he saw Hurtado swinging the steel bar twice; and (2) to preclude the admission of Scalmanini's testimony. The evidence against defendant was extremely strong. Defendant twice indicated that he wanted to fight Hurtado, repeatedly went to Hurtado's house, stabbed him when his attention was diverted, and said, "I got him, I got him," as he fled the scene. During police interviews on the night of the killing, defendant denied that he had been hit with a metal object and did not indicate that he had acted in self-defense. Thus, even considering the prejudice cumulatively from trial counsel's deficient performance, there was no reasonable probability that defendant would have received a more favorable verdict. (*Benavides*, *supra*, 35 Cal.4th at pp. 92-93.)

47

## E.  Cumulative Error

Defendant argues that he was deprived of a fair trial by the cumulative impact of the instructional errors and the ineffective assistance of his trial counsel.  We have either rejected his claims or found an error to be harmless.  Viewed cumulatively, we find that any errors do not warrant reversal of the judgment.  (*People v. Stitely* (2005) 35 Cal.4th 514, 560.)

## III.    Disposition

The judgment is affirmed.

_____
Mihara, J.

WE CONCUR:


_____
Premo, Acting P. J.




_____
Grover, J.